EXHIBIT 1



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York New York 10007*

November 18, 2018

Keith Krakaur, Esq.
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street, Canary Wharf
London, E14 5DS
United Kingdom

David Braff, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004

### Re: Société Générale S.A. – Deferred Prosecution Agreement

Dear Messrs. Krakaur and Braff:

Pursuant to the understandings specified below, the Office of the United States Attorney for the Southern District of New York (the "Office") and defendant Société Générale S.A. ("SG"), under authority granted by its Board of Directors in the form of a Board Resolution (a copy of which is attached hereto as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement").

### The Criminal Information

1.      SG consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging SG with conspiring to violate the Trading with the Enemy Act ("TWEA"), Title 50, United States Code, Sections 4303, 4305 and 4315(a), and the Cuban Assets Control Regulations, Title 31, Code of Federal Regulations, Section 515.201, promulgated thereunder. A copy of the Information is attached hereto as Exhibit B. This Agreement shall take effect upon its execution by both parties.

### Acceptance of Responsibility

2.      SG stipulates that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate, and admits, accepts and acknowledges that it is responsible under United States law for the acts of its current and former officers and employees as set forth in the Statement of Facts. Should the Office pursue the prosecution that is deferred by this Agreement, SG stipulates to the admissibility of the Statement of Facts in any proceeding including any trial and sentencing proceeding.

1

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

## Payments and Forfeiture Obligation

3. As a result of the conduct described in the Information and the Statement of Facts, SG agrees to pay $717,200,000 to the United States (the "Stipulated Forfeiture Amount") pursuant to this Agreement. SG has further agreed to pay the following monetary penalties in connection with its concurrent settlement of related criminal and civil actions (the "Related Settlements"): $162,800,000 to the New York County District Attorney's Office ("DANY"); $53,900,000 to the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"); $81,265,000 to the Federal Reserve Board of Governors and the Federal Reserve Bank of New York (collectively the "Federal Reserve"); and $325,000,000 to the New York State Department of Financial Services ("DFS").

4. SG agrees that the Stipulated Forfeiture Amount represents a substitute *res* for proceeds of the offense that were transferred by SG or its subsidiaries in connection with the conduct described in the Statement of Facts, and is subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

5. SG further agrees that this Agreement, the Information and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint") that will be filed against the Stipulated Forfeiture Amount. By this agreement, SG expressly waives any challenge to that Civil Forfeiture Complaint and consents to the forfeiture of the Stipulated Forfeiture Amount to the United States. SG agrees that it will not file a claim with the Court or otherwise contest the civil forfeiture of the Stipulated Forfeiture Amount and will not assist or direct a third party in asserting any claim to the Stipulated Forfeiture Amount. SG also waives all rights to service or notice of the Civil Forfeiture Complaint.

6. SG shall transfer the Stipulated Forfeiture Amount to the United States by no later than November 19, 2018 (or as otherwise directed by the Office following such date). Such payment shall be made by wire transfer to the United States Treasury, pursuant to wire instructions provided by the Office. If SG fails to timely make the payment required under this paragraph, interest (at the rate specified in Title 28, United States Code, Section 1961) shall accrue on the unpaid balance through the date of payment, unless the Office, in its sole discretion, chooses to reinstate prosecution pursuant to paragraphs 14 and 15 below. SG certifies that the funds used to pay the Stipulated Forfeiture Amount are not the subject of any lien, security agreement, or other encumbrance. Transferring encumbered funds or failing to pass clean title to these funds in any way will be considered a breach of this Agreement.

7. SG agrees that the Stipulated Forfeiture Amount shall be treated as a penalty paid to the United States government for all purposes, including all tax purposes. SG agrees that it will not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state, local, or foreign tax for any portion of the $717,200,000 that SG has agreed to pay to the United States pursuant to this Agreement. To the extent the Office chooses to reinstate prosecution pursuant to paragraphs 14 and 15, the Office agrees that under those circumstances, it shall recommend to the Court that the Stipulated Forfeiture Amount should be offset against any fine or forfeiture the Court imposes as part of a future judgment.

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

## Obligation to Cooperate

8.      SG agrees to cooperate fully with the Office, DANY, OFAC, the Federal Reserve, DFS, and any other governmental agency designated by the Office regarding any matter relating to the conduct described in the Information or Statement of Facts.

9.      It is understood that SG shall, subject to paragraph 10 below, (a) truthfully and completely disclose all information with respect to the activities of SG, its officers, agents, and employees, and any affiliates that it controls concerning all matters about which the Office inquires of it, which information can be used for any purpose; (b) attend all meetings at which the Office requests its presence and use its reasonable best efforts to secure the attendance and truthful statements or testimony of any past or current officers, agents, or employees of SG at any meeting or interview or before the grand jury or at trial or at any other court proceeding; (c) provide to the Office upon request any document, record, or other tangible evidence relating to matters about which the Office or any designated law enforcement agency inquires of it; (d) assemble, organize, and provide in a responsive and prompt fashion, and upon request, on an expedited schedule, all documents, records, information and other evidence in SG's possession, custody or control as may be requested by the Office; (e) volunteer and provide to the Office any information and documents that come to SG's attention that it understands may be relevant to the Office's investigation of this matter or any issue related to the Statement of Facts; (f) provide testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Office, or any governmental agency designated by the Office; and (g) bring to the Office's attention all criminal conduct by SG or any of its agents or employees acting within the scope of their employment related to violations of the federal laws of the United States, as to which SG's Board of Directors, senior management, or United States legal and compliance personnel are aware.  In addition, SG shall (i) bring to the Office's attention any administrative, regulatory, civil or criminal proceeding or investigation of SG or any agents or employees acting within the scope of their employment relating to United States sanctions or anti-money laundering laws; and (ii) commit no crimes under the federal laws of the United States subsequent to the execution of this Agreement.

10.      Nothing in this Agreement shall be construed to require SG to take any steps in violation of applicable law, including, but not limited to providing information, documents, or testimony (including interviews of any officer, employee, agent, consultant, or representative) that is prohibited from disclosure by French, European Union, or other applicable laws, including data protection, bank secrecy, and other local confidentiality laws, or by the rules and regulations of banking regulators regarding the disclosure of confidential supervisory information. Nor shall anything in this Agreement shall be construed to require SG to provide information, documents, or testimony protected by the attorney-client privilege, work product doctrine, or other applicable privileges. To the extent that SG believes that any materials it would otherwise be required to produce pursuant to this Agreement are covered by any such laws or privileges, SG shall notify the Office of the existence and type of such materials. At the request of the Office, SG shall also provide (a) a log of all materials withheld on these grounds and (b) a written explanation of the operation and application of any law or privilege under which SG concludes that it would be impermissible to produce the materials to the Office, and any methods

3

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

or procedures by which production of such materials may be authorized. To the extent SG believes that production of such materials would violate applicable laws or regulations, it shall use its best efforts to produce such materials, including by obtaining approval from the appropriate governmental agency or court to produce the materials, or by supporting an application made by the Office to the appropriate governmental agency or court, for production of the requested materials to the Office. Furthermore, it is understood and agreed that the obligations in this Agreement do not apply to any affiliates that are not controlled by SG.

11.    SG agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date of the execution of this Agreement, unless otherwise extended pursuant to paragraph 16 below. SG's obligation to cooperate pursuant to this Agreement shall terminate in the event that a prosecution against SG by this Office is pursued.

## Deferral of Prosecution

12.    The Office agrees that the prosecution of SG on the Information be deferred for three years from the date of the execution of the Agreement. This decision reflects a variety of factors and considerations, including but not limited to SG's acceptance and acknowledgement of responsibility under the laws of the United States for its conduct, as exhibited by its undertaking of a thorough internal investigation, collecting and producing voluminous evidence located in other countries to the full extent permitted under applicable laws and regulations, providing frequent and regular updates to the Office, and its enhancement of its compliance program and sanctions-related internal controls both before and after it became the subject of a U.S. law enforcement investigation. In reaching this decision, the Office also considered SG's commitment to: (a) cooperate with the Office, DANY, OFAC, the Federal Reserve, DFS and any other law enforcement agency designated by this Office; (b) make the payments specified in paragraph 3 of this Agreement; (c) commit no future crimes under the federal laws of the United States (as provided herein in paragraph 9); and (d) otherwise comply with all of the terms of this Agreement. All of the above factors and considerations, as well as others, collectively weighed in favor of deferral of prosecution in this case, and outweighed in this particular case SG's decision not to self-report all its violations of United States sanctions laws in a timely manner. SG shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.

13.    It is understood that this Office cannot, and does not, agree not to prosecute SG for criminal tax violations. However, if SG fully complies with the terms of this Agreement, no testimony given or other information provided by SG (or any other information directly or indirectly derived therefrom) will be used against SG in any criminal tax prosecution. In addition, the Office agrees that, if SG is in compliance with all of its obligations under this Agreement, the Office will, within thirty (30) days after the expiration of the period of deferral (including any extensions thereof), seek dismissal with prejudice of the Information filed against SG pursuant to this Agreement. Except in the event of a violation by SG of any term of this

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

Agreement or as otherwise provided in paragraph 14, the Office will bring no additional charges against SG, its subsidiaries, predecessors, successors or any affiliate that it controls, except for criminal tax violations, relating to conduct described in the Statement of Facts or otherwise disclosed to the Office during its investigation of this matter. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than SG, its subsidiaries and any affiliate that it controls. SG and the Office understand that the Agreement to defer prosecution of SG can only operate as intended if the Court grants a waiver of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(2). Should the Court decline to do so, both the Office and SG are released from any obligation imposed upon them by this Agreement, and this Agreement shall be null and void, except for the tolling provision set forth in paragraph 14.

14.    It is further understood that should the Office in its sole discretion determine that SG has: (a) knowingly given false, incomplete or misleading information either during the term of this Agreement or in connection with the Office's investigation of the conduct described in the Information and Statement of Facts, (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement, or (c) otherwise violated any provision of this Agreement, SG shall, in the Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, of which the Office has knowledge, including but not limited to a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice. Any such prosecution or civil action may be premised on any information provided by or on behalf of SG to the Office, the Internal Revenue Service ("IRS"), DANY, OFAC, the Federal Reserve, or DFS at any time. In any such prosecution or civil action, it is understood that: (i) no charge or claim would be time-barred provided that such prosecution or civil action is brought within the applicable statute of limitations period (subject to any prior tolling agreements between the Office and SG), excluding the period from the execution of this Agreement until its termination; (ii) SG agrees to toll, and exclude from any calculation of time, the running of the applicable statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to paragraph 16 below; and (iii) SG waives any objection to venue with respect to any charges arising out of the conduct described in the Statement of Facts and consents to the filing of such charges in the Southern District of New York. By this Agreement, SG expressly intends to and hereby does waive its rights in the foregoing respects, including the right to make a claim premised on the statute of limitations as set forth above, as well as any constitutional, statutory, or other claim concerning pre-indictment delay as set forth above. Such waivers are knowing, voluntary, and in express reliance on the advice of SG's counsel.

15.    It is further agreed that in the event that the Office, in its sole discretion, determines that SG has violated any provision of this Agreement, including by failure to meet its obligations under this Agreement: (a) SG shall not object to the admissibility of all statements made or acknowledged by or on behalf of SG to the Office, IRS, DANY, OFAC, Federal Reserve or DFS including but not limited to the Statement of Facts, or any testimony given by SG or by any agent of SG before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, in any and all criminal proceedings hereinafter brought by the Office against SG; and (b) SG shall not assert any claim under the

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made or acknowledged by or on behalf of SG before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive any and all rights in the foregoing respects.

16.     SG agrees that, in the event that the Office determines during the period of deferral of prosecution described in paragraph 12 above (or any extensions thereof) that SG has violated any provision of this Agreement, an extension of the period of deferral of prosecution may be imposed in the sole discretion of the Office, up to an additional one year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four (4) years. Any extension of the deferral-of-prosecution period extends all terms of this Agreement for an equivalent period. In the event the Office finds that there exists a change in circumstances sufficient to eliminate the need for the cooperation requirements set forth in paragraphs 8 and 9 above, and the reporting requirements in paragraphs 21 through 23 below, and that the other provisions of this Agreement have been satisfied, the Office may, in its sole discretion, choose to terminate SG's obligations under the Agreement and seek dismissal with prejudice of the Information filed against SG before the end of the period of deferral of prosecution described in paragraph 12.

17.     SG, having truthfully admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, employees, or others authorized to speak on its behalf, make any statement to any person outside of SG, in litigation or otherwise, contradicting the Statement of Facts or this Agreement. Consistent with this provision, SG may raise defenses and/or assert affirmative claims in any proceedings brought by private and/or public parties as long as doing so does not contradict the Statement of Facts. Any such contradictory statement by SG, its present or future attorneys, agents, employees, or others authorized to speak on its behalf shall constitute a violation of this Agreement and SG thereafter may be subject to prosecution as specified in paragraphs 14 through 15, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 16, above, unless SG subsequently cures such violation as set forth below. The decision as to whether any such contradictory statement will be imputed to SG for the purpose of determining whether SG has violated this Agreement shall be within the sole discretion of the Office. If the Office determines that a statement to any person outside of SG by any such person contradicts a statement contained in the Statement of Facts, the Office shall so notify SG. Upon the Office's notifying SG of any such contradictory statement, SG may cure such a violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within five business days after having been provided notice by the Office. SG consents to the public release by the Office, in its sole discretion, of any such repudiation. This paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of SG in the course of any criminal, regulatory, or civil investigation or case initiated against such individual or by such individuals against SG, unless such individual is speaking on behalf of SG. Nothing in this Agreement affects the obligation of SG or its officers, directors, agents or employees to testify truthfully in any investigation or proceeding.

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

18.     SG agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 14 and 15 above, or instead to choose to extend the period of deferral of prosecution pursuant to paragraph 16, provided, however, that if SG's violation of this Agreement is limited to an untimely payment of the Stipulated Forfeiture Amount, the Office may elect instead to choose the additional payment of interest by SG set forth in paragraph 6, above.  Should the Office determine that SG has violated this Agreement, the Office shall provide written notice to SG of that determination and provide SG with an opportunity within a period of no less than thirty (30) days to make a presentation to the Office to demonstrate that no violation occurred or, to the extent applicable, that the violation should not result in the exercise of any of those remedies, including because the violation has been cured by SG.

19.     SG understands and agrees that the exercise of the Office's discretion under this Agreement, including the Office's determination regarding whether SG has violated any provision of this Agreement and whether to pursue the remedies contained in paragraphs 14, 15, and 16, is unreviewable by any court.

## The Related Settlements and the Bank's Compliance Programs

20.     SG shall comply with any and all terms of the Related Settlements, including but not limited to implementing all remedial changes to its compliance programs required by the Related Settlements, and shall further comply with any other Consent Order, Cease-and-Desist Order, or equivalent order issued by any of its U.S. Federal or State regulators regarding its sanctions or Bank Secrecy Act/anti-money laundering compliance programs.  A failure by SG to comply with the Related Settlements or such orders by its U.S. Federal or State regulators shall not constitute a violation of this Agreement unless the failure to comply was willful and intentional.  The determination of whether SG has failed to comply and whether such a violation was willful and intentional, for purposes of this Agreement, shall be within the sole discretion of the Office.

## Review of the Bank's Compliance Programs

21.     For the duration of the Agreement, SG shall provide the Office with quarterly reports within thirty (30) days after the end of each calendar quarter ("Quarterly Reports") describing the status of SG's implementation of any remedial changes to its sanctions or Bank Secrecy Act/anti-money laundering compliance programs required by the Related Settlements, by any other Consent Order, Cease-and-Desist Order, or equivalent order issued by any of its U.S. Federal or State regulators.  The Quarterly Reports shall identify any violations of United States sanctions laws that have come to the attention of SG's legal and compliance personnel during this reporting period.  SG further agrees that any compliance consultant or monitor imposed by any U.S. Federal or State regulator of SG shall, at SG's own expense, submit to the Office any report that it submits to that regulator.  It is understood that any violation of United States sanctions laws arising from conduct exclusively occurring prior to the date of execution of this Agreement will not constitute a breach of SG's obligations pursuant to this Agreement.  However, there shall be no limitation on the ability of the Office to investigate or prosecute such violations and/or conduct in accordance with the applicable law and the other

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

terms of this Agreement, including paragraph 13 hereof. In the event the Office finds that there exists a change in circumstances sufficient to eliminate the need for any portion of the reporting requirements set forth in this paragraph, the Office may, in its sole discretion, choose to suspend or terminate those requirements in whole or in part.

22.    For the duration of this Agreement, the Office, as it deems necessary and upon request to SG, shall: (a) be provided by SG with access to any and all non-privileged books, records, accounts, correspondence, files, and any and all other documents or other electronic records, including e-mails, of SG and its representatives, agents, affiliates that it controls, and employees, relating to any matters described or identified in the Quarterly Reports; and (b) have the right to interview any officer, employee, agent, consultant, or representative of SG concerning any non-privileged matter described or identified in the Quarterly Reports.

23.    It is understood that SG shall promptly notify the Office of (a) any deficiencies, failings, or matters requiring attention with respect to the Bank's sanctions compliance program identified by any U.S. Federal or State regulatory authority within 30 business days of any such regulatory notice; and (b) any steps taken or planned to be taken by SG to address the identified deficiency, failing, or matter requiring attention. The Office may, in its sole discretion, direct SG to provide other reports about its sanctions compliance program as warranted.

## Limits of this Agreement

24.    It is understood that this Agreement is binding on the Office but does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities. However, if requested by SG or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the nature and quality of SG's cooperation, and SG's compliance with its obligations under this Agreement.

## Sale or Merger of SG

25.    Except as may otherwise be agreed by the parties hereto in connection with a particular transaction, SG agrees that in the event it sells, merges, or transfers all or substantially all of its banking operations as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, or transfer, it shall include in any contract for sale, merger or transfer a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.

## Public Filing

26.    SG and the Office agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments hereto) to the Court, this Agreement (and its attachments) shall be filed publicly in the proceedings in the Court.

27.    The parties understand that this Agreement reflects the unique facts of this case and is not intended as precedent for other cases.

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

### Execution in Counterparts

28.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.   Further, all digital images of signatures shall be treated as originals for all purposes.

### Integration Clause

29.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between SG and the Office.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, SG's attorneys, and a duly authorized representative of SG.

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By:     _____

ALEXANDER WILSON
BENET KEARNEY
Assistant United States Attorneys

_____

LISA ZORNBERG
Chief, Criminal Division

Accepted and agreed to:


_____          _____
NICOLAS BROOKE                            Date
Managing Director, General Counsel for Litigation
and Investigations, Société Générale S.A.


_____          _____
KEITH D. KRAKAUR, ESQ.                    Date
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Attorney for Société Générale S.A.

9

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

## Execution in Counterparts

28.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.   Further, all digital images of signatures shall be treated as originals for all purposes.

## Integration Clause

29.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between SG and the Office.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, SG's attorneys, and a duly authorized representative of SG.

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By:     _____

ALEXANDER WILSON
BENET KEARNEY
Assistant United States Attorneys

_____

LISA ZORNBERG
Chief, Criminal Division

Accepted and agreed to:

_____          18·XI·18
NICOLAS BROOKE                                                  Date
Managing Director, General Counsel for Litigation
and Investigations, Société Générale S.A.

_____          _____
KEITH D. KRAKAUR, ESQ.                                    Date
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Attorney for Société Générale S.A.

9

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

### Execution in Counterparts

28.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.  Further, all digital images of signatures shall be treated as originals for all purposes.

### Integration Clause

29.     This Agreement sets forth all the terms of the Deferred Prosecution Agreement between SG and the Office.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, SG's attorneys, and a duly authorized representative of SG.

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By:     _____

ALEXANDER WILSON
BENET KEARNEY
Assistant United States Attorneys

_____

LISA ZORNBERG
Chief, Criminal Division

Accepted and agreed to:

_____          _____
NICOLAS BROOKE                                               Date
Managing Director, General Counsel for Litigation
and Investigations, Société Générale S.A.

_____          11/18/18
KEITH D. KRAKAUR, ESQ.                               Date
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Attorney for Société Générale S.A.

9

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018


_Jamie Boucher_____     Nov. 18, 2018
JAMIE L. BOUCHER, ESQ.                Date
Skadden, Arps, Slate, Meagher & Flom LLP
Attorney for Société Générale S.A.


_____     _____
RYAN D. JUNCK, ESQ.                  Date
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Attorney for Société Générale S.A.


_____     _____
DAVID BRAFF, ESQ.                    Date
Sullivan & Cromwell LLP
Attorney for Société Générale S.A.

10

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018

_____     _____
JAMIE L. BOUCHER, ESQ.                           Date
Skadden, Arps, Slate, Meagher & Flom LLP
Attorney for Société Générale S.A.

_____     _____
RYAN D. JUNCK, ESQ.                              Date
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Attorney for Société Générale S.A.

_____     _____
DAVID BRAFF, ESQ.                                Date
Sullivan & Cromwell LLP
Attorney for Société Générale S.A.

Keith Krakaur, Esq.
David Braff, Esq.
November 18, 2018


_____          _____
JAMIE L. BOUCHER, ESQ.                          Date
Skadden, Arps, Slate, Meagher & Flom LLP
Attorney for Société Générale S.A.


_____          _____
RYAN D. JUNCK, ESQ.                             Date
Skadden, Arps, Slate, Meagher & Flom (UK) LLP
Attorney for Société Générale S.A.


*David Braff /AB*                               *Nov. 18, 2018*
_____          _____
DAVID BRAFF, ESQ.                               Date
Sullivan & Cromwell LLP
Attorney for Société Générale S.A.

10

EXHIBIT A

<u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>

WHEREAS, Société Générale S.A. (the "Company" or "Société Générale") has been engaged in discussions with the United States Attorney's Office for the Southern District of New York and the New York County District Attorney's Office (collectively, the "Offices") regarding issues arising in relation to certain U.S. dollar transactions processed by Société Générale involving countries that are the subject of sanctions enforced by the United States Department of the Treasury's Office of Foreign Assets Control;

WHEREAS, in order to resolve such discussions with the Offices, it is proposed that the Company enter into certain agreements with the Offices;

WHEREAS, the Company has also been engaged in discussions with the Office of Foreign Assets Control of the U.S. Department of the Treasury, the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of New York, and the New York State Department of Financial Services regarding the same issues; and

WHEREAS, the Company's General Secretary, Gilles Briatta, together with outside counsel for the Company, have advised the Board of Directors regarding the terms and conditions of the agreements with the Offices, including advising the Company of its rights, possible defenses, the relevant United States Sentencing Guidelines provisions, and the consequences of entering into the agreements with the Offices;

Therefore, after deliberation, the Board of Directors has RESOLVED that:

The Board of Directors approves the terms and conditions of the proposed agreements between the Company and the Offices, including but not limited to payment under the agreements

of monetary penalties totaling $880,000,000, and the waiver of rights described in the deferred prosecution agreements ("DPAs") with the Offices;

The Board of Directors (a) acknowledges the filing of the one-count Information by the United States Attorney's Office for the Southern District of New York in the United States District Court for the Southern District of New York charging the Company with one count of conspiracy to commit offenses against the United States in violation of Title 18, United States Code, Section 371, by engaging in transactions in violation of Title 50, United States Code, Sections 4303, 4305, and 4315(a), and Title 31, Code of Federal Regulations, Sections 515.201(a)(1), (c) and (d); (b) approves waiving indictment on such charges and entering into the DPAs; and (c) agrees to accept a civil forfeiture against the Company totaling $880,000,000 with respect to the conduct described in the one-count Information mentioned above, and to pay $717,200,000 of said forfeiture amount to the United States Treasury and $162,800,000 of said forfeiture amount to the New York County District Attorney's Office ;

Frédéric Oudéa, in his capacity as Chief Executive Officer of Société Générale, with the right to subdelegate to Dominique Bourrinet and/or Nicolas Brooke, in their respective capacities as Group General Counsel and General Counsel for Litigation and Investigations of Société Générale, either individually or collectively, is hereby authorized, empowered and directed, on behalf of the Company, to execute the agreements with the Offices substantially in such form as provided to this Board of Directors at this meeting with such changes as the Company's Chief Executive Officer, Frédéric Oudéa (or the Company's Group General Counsel and/or the Company's General Counsel for Litigation and Investigations, Dominique Bourrinet and Nicolas Brooke, respectively, in case of subdelegation), may approve;

Frédéric Oudéa, in his capacity as Chief Executive Officer of Société Générale (or Dominique Bourrinet and/or Nicolas Brooke, in their capacities as Group General Counsel and General Counsel for Litigation and Investigations of Société Générale, respectively, in case of subdelegation) is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions, including but not limited to participating in legal proceedings in the United States; and

All of the actions of Frédéric Oudéa, in his capacity as Chief Executive Officer of Société Générale, and/or Dominique Bourrinet and/or Nicolas Brooke, in their respective capacities as Group General Counsel and General Counsel for Litigation and Investigations of Société Générale, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: *November 18th 2018*

By:    Patrick Suet

Corporate Secretary

3

EXHIBIT B

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X
                                        :    **INFORMATION**
                                        :
UNITED STATES OF AMERICA                     18 Cr.
                                        :
        - v. -                          :
                                        :
SOCIÉTÉ GÉNÉRALE S.A.,
                                        :
              Defendant.
                                        :

- - - - - - - - - - - - - - - - - - - X
```

## COUNT ONE

### (Conspiracy to Violate the Trading with the Enemy Act)

The United States Attorney charges:

1.   From at least in or about 2004 through in or about 2010, in the Southern District of New York and elsewhere, SOCIÉTÉ GÉNÉRALE S.A., the defendant, together with others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, a violation of the Trading with the Enemy Act and the Cuban Assets Control Regulations promulgated thereunder.

2.   It was a part and an object of the conspiracy that SOCIÉTÉ GÉNÉRALE S.A., the defendant, and others known and unknown, willfully and knowingly would and did violate regulations prohibiting all transfers of credit and all payments between, by, through, and to any banking institution, with

respect to any property subject to the jurisdiction of the United States, in which Cuba has any interest of any nature whatsoever, direct or indirect, and the evasion and avoidance of the aforementioned prohibition, to wit, SOCIÉTÉ GÉNÉRALE S.A., the defendant, willfully and knowingly violated U.S. sanctions against Cuba by structuring, conducting and concealing U.S. dollar transactions using the U.S. financial system in connection with U.S. dollar credit facilities involving Cuba, including facilities provided to Cuban banks and other entities controlled by Cuba, and to Cuban and foreign corporations for business conducted in Cuba, in violation of Title 50, United States Code, Sections 4303, 4305, and 4315(a), and Title 31, Code of Federal Regulations, Sections 515.201(a)(1), (c) and (d).

(Title 18, United States Code, Section 371.)

### FORFEITURE ALLEGATION

3.    As a result of committing the offense alleged in Count One of this Information, SOCIÉTÉ GÉNÉRALE S.A., the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to a

2

sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

### Substitute Assets Provision

4.   If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third person;

c.   has been placed beyond the jurisdiction of the Court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

GEOFFREY S. BERMAN
United States Attorney

3

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

**- v. -**

**SOCIÉTÉ GÉNÉRALE S.A.,**
**Defendant.**

---

**INFORMATION**

18 Cr.

(18 U.S.C. § 371)

GEOFFREY S. BERMAN
United States Attorney.

EXHIBIT C

**STATEMENT OF FACTS**

1.      This Statement of Facts is made pursuant to, and is part of, the Deferred

Prosecution Agreement dated November 18, 2018 between the United States Attorney's Office

for the Southern District of New York ("SDNY") and Société Générale S.A. ("SG"), a French

bank, and the Deferred Prosecution Agreement dated November 18, 2018 between the New York

County District Attorney's Office ("DANY") and SG.

2.      The parties agree and stipulate that the information contained in this Statement of

Facts is true and accurate.

**Introduction**

3.      SG is a financial institution and global financial services company headquartered

in Paris, France, which maintains a branch located in New York, New York ("SGNY").  During

the relevant time period, SG's top-level management or "General Management" was led by a

Chairman and Chief Executive Office ("CEO") and was responsible for preparing and

supervising the implementation of bank strategy, as determined by SG's Board of Directors.  To

that end, General Management oversaw the Executive Committee ("COMEX"), which was

responsible for the implementation of those strategies.  Below General Management were the

various divisions with bank-wide, or "Group," functions, including the Risk Division ("RISQ")

and the General Secretariat ("SEGL").  RISQ was tasked with the supervision of SG's credit,

market, and operational risk and had teams dedicated to each of SG's business lines.  SEGL was

responsible for the supervision of the administration, compliance, legal, tax, insurance, and

corporate social responsibility functions and served as the liaison between SG  and its regulators,

including foreign regulators.[1]  SG's business lines include its retail banking operation in France, Banque de Détail en France ("BDDF") and its Global Finance Department ("GLFI").

4.      Starting in at least 2004, up through and including 2010, SG knowingly and willfully violated U.S. and New York State laws by illegally sending payments through the U.S. financial system in violation of U.S. economic sanctions, which caused both affiliated and unaffiliated U.S. financial institutions to process transactions that otherwise should have been rejected, blocked or stopped for investigation pursuant to regulations promulgated by the Office of Foreign Assets Control of the United States Department of Treasury ("OFAC") relating to transactions involving sanctioned countries and parties.

## U.S. Sanctions Laws

5.      Pursuant to U.S. law, financial institutions, including SG, are prohibited from participating in certain financial transactions involving persons, entities, and countries that are subject to U.S. economic sanctions ("Sanctioned Entities").  The United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") promulgates regulations to administer and enforce U.S. law governing economic sanctions, including regulations for sanctions related to specific countries, as well as sanctions related to Specially Designated Nationals ("SDNs").  SDNs are individuals and companies specifically designated by OFAC as having their assets blocked from the U.S. financial system by virtue of being owned or controlled by, or acting for or on behalf of, targeted countries, as well as individuals, groups, and entities, such as terrorists and narcotics traffickers, designated under sanctions programs that are not country-specific.  Violators of OFAC regulations are subject to a range of penalties, both criminal and civil, and

---

[1]      The Group Compliance function now reports directly to General Management.

U.S. financial institutions that discover sanctions-violating transactions are required to block or reject those transactions from proceeding and hold the funds involved.

*Cuba Sanctions*

6.       Beginning with Executive Orders issued in 1960 and 1962, the United States has maintained an economic embargo against Cuba through the enactment of various laws and regulations.  Pursuant to the Trading with the Enemy Act ("TWEA"), 50 U.S.C. § 4305(b)(1) *et seq.*, OFAC has promulgated the Cuban Assets Control Regulations (the "Cuba Regulations"), which bar financial transactions through the United States for the benefit of Cuban parties, or which involve Cuban property.  Specifically, in relevant part, the Cuba Regulations prohibit "[a]ll transfers of credit and all payments between, by, through, or to any banking institution or banking institutions wheresoever located, with respect to any property subject to the jurisdiction of the United States or by any person (including a banking institution) subject to the jurisdiction of the United States" that are undertaken "by, or on behalf of, or pursuant to the direction of [Cuba or any Cuban nationals], or that "involve property in which [Cuba or any Cuban national] has or had any interest of any nature whatsoever, direct or indirect [after July 8, 1963]." 31 C.F.R. § 515.201 (a)(1) and (d).  The Cuba Regulations further prohibit "[a]ny transaction for the purpose or which has the effect of evading or avoiding" those restrictions.  31 C.F.R. § 515.201(c)

7.       Pursuant to Title 50, United States Code, Section 4315(a) and Title 31, Code of Federal Regulations, Section 501.701, it is a crime to willfully violate any of the regulations issued pursuant to TWEA, including the Cuba Regulations.

*Sanctions Involving Other Countries*

8.      The International Economic Emergency Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, authorizes the president "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, including the authority to "investigate, regulate, or prohibit . . . any transactions in foreign exchange," "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and "the importing or exporting of currency or securities by any person, or with respect to any property, subject to the jurisdiction of the United States[,]" 50 U.S.C. § 1702(a)(1)(A).  Pursuant to Title 50, United States Code, Section 1705, it is a crime for any person to "willfully commit[], willfully attempt[] to commit, or willfully conspire[] to commit, or [to] aid[] or abet[] in the commission of" a violation of any regulation or prohibition issued under IEEPA.  50 U.S.C. § 1705(a).

9.      At various points in time, presidents have invoked their authority pursuant to IEEPA to impose sanctions on countries that posed a threat to United States security, including, since the 1990's, Iran, Myanmar, Libya, Sudan, and North Korea, and entities and individuals affiliated with those countries.  OFAC has promulgated regulations making it unlawful to export goods and services from the United States, including U.S. financial services, to sanctioned countries, individuals, and entities without a license from OFAC.  OFAC has provided exemptions for certain types of transactions, however.  For example, until November 2008, OFAC permitted U.S. banks to act as an intermediary bank for U.S. dollar transactions related to

4

Iran between two non-U.S., non-Iranian banks (the "U-turn exemption").  The U-turn exemption

applied only to sanctions regarding Iran, and not to sanctions against other countries or entities,

and only applied until November 2008.

### New York State Law Regarding False Business Records

10.     DANY has alleged, and SG accepts, that its conduct, as described herein, violated

New York State Penal Law Sections 175.05 and 175.10, which make it a crime to, "with intent to

defraud,…1. [m]ake[] or cause[] a false entry in the business records of an enterprise [(defined as

any company or corporation)]…or 4. [p]revent[] the making of a true entry or cause [] the

omission thereof in the business records of an enterprise."  It is a felony under Section 175.10 of

the New York State Penal Law if a violation under Section 175.05 is committed and the person's

or entity's "intent to defraud includes an intent to commit another crime or aid or conceal the

commission thereof."

### Transaction Processing Mechanisms

11.     Financial institutions typically transfer funds through a series of electronic

messages directing one another to make the debit and credit accounting entries necessary to

complete the transaction.  Financial institutions regularly employ a messaging system maintained

by the Belgium-based Society for Worldwide Interbank Financial Telecommunications,

otherwise known as "SWIFT," to effectuate cross-border transfers.  Financial institutions in the

United States that process U.S. dollar transactions from other countries utilize sophisticated

filters designed to identify and block or reject any transactions involving entities that have been

sanctioned by OFAC.  The filters generally work by screening wire transfer messages, including

SWIFT messages, for any reference to (a) countries under U.S. embargo such as Iran and Cuba,

(b) all entities and individuals identified by OFAC as SDNs, and (c) any words or numbers in

wire messages that would indicate that the transaction being processed through the United States involved entities that were subject to U.S. sanctions.  Transactions that are identified as violating U.S. sanctions are rejected or blocked and the funds involved may be seized.

## Overview of the Conspiracy

12.     From at least 2004, up through and including 2010, SG conspired with others known and unknown to knowingly and willfully violate United States sanctions against Cuba by structuring, conducting, and concealing U.S. dollar transactions using the U.S. financial system, and in particular financial institutions located in the County of New York, in connection with U.S. dollar credit facilities involving Cuba, including facilities provided to Cuban banks and other entities controlled by Cuba, and to Cuban and foreign corporations for business conducted in Cuba.  SG accomplished this in part by making inaccurate or incomplete notations on SWIFT messages related to these transactions.  In total, SG engaged in more than 2,500 sanctions-violating transactions through financial institutions located in the County of New York, valued at close to $13 billion, during this period.

13.     Separately, SG also engaged in a broader practice of processing U.S. transfers on behalf of sanctioned entities while omitting information about the sanctioned entities from the accompanying payment messages to U.S. financial institutions located in the County of New York, in order to circumvent U.S. sanctions (the "Concealment Practice").  With isolated exceptions, this broader practice was terminated by early 2007, and was outside the statute of limitations for TWEA or IEEPA violations, and for violations of New York State law, before the commencement of the investigation of SG.

**SG's Concealment Practice**

14.     Since at least 2002, SG engaged in the Concealment Practice in order to minimize the risk that sanctions-violating transactions would be detected and/or blocked in the United States.  SG employees used cover payments for this purpose, in which SG would send one SWIFT payment message to the relevant U.S. bank, located in the County of New York, omitting the "beneficiary" field that would otherwise disclose the ultimate beneficiary of the payment, and listing only the bank to which the funds should be sent.  SG would then send a second SWIFT message to the non-U.S. recipient bank, providing the name of the sanctioned party beneficiary to whom the funds should be remitted.  Using this procedure (the "Cover Procedure"), SG would ensure that the sanctioned party beneficiary information was not disclosed to the United States bank that was involved in the transaction.[2]

15.     SG employees of the business lines that dealt with sanctioned entities, including GLFI, Correspondent Banking,  Money Markets, Coverage and Investment Banking ("CORI"), and the Foreign Exchange and Treasury Departments, as well as BDDF and certain overseas branches, processed payments in such a way as to ensure that references to sanctioned entities did not appear in U.S. dollar payment transfer messages.  For example, in July 2002, a manager in SG's Natural Resources and Energy Financing department ("NAT"),[3] which was responsible for the operation of credit facilities involving Cuba, sent instructions regarding a proposed credit facility involving a joint venture between a French commodities trading company and a Cuban government entity.  In those instructions, the manager noted that:

> "We are going to receive transfer orders in USD in favor of certain
> suppliers in non-Cuban banks. **In this case, the USD transfer must not**

---

[2]  Until November 2009, the applicable SWIFT protocols did not require a reference to the ordering party in Single Customer Transfers processed as MT103/202 cover messages.

[3]  NAT was based in Paris and was a component of GLFI.

**in any case mention the name of the ordering party [the joint venture]
or its country of origin, Cuba.  The clearing will indeed be carried out
in NY.  I have explicitly asked [the joint venture] to write on its
transfer request the instructions to be included.**" (bold in original).

The Concealment Practice was used to send U.S. dollar payments to Cuban banks and corporate

beneficiaries in connection with other credit facilities involving Cuba that NAT operated.

16.     SG's Cover Procedure was memorialized in writing in 2003, as part of

discussions among various SG departments regarding how to deal with U.S. dollar payments that

involved sanctioned country financial institutions.  In July 2003, a senior member of CORI

proposed that SG define "a procedure and a common SG position that we will have to relay to

the banks under embargo (Iran, Libya, etc.) for the issuance and receipt of transfers in USD."

This was followed by an August 2003 meeting among CORI, Correspondent Banking, Treasury,

and Group Compliance representatives regarding "USD payments to or from OFAC blacklisted

financial Institutions" in light of a recommendation by the Financial Action Task Force on

Money Laundering ("FATF")[4] that correspondent banks identify the ultimate customer ordering

a payment.  As a result of that meeting, a senior member of SG's Treasury Department's back

office, drafted a document entitled "Scheme for international settlement" which applied where

"the customer belongs to a country under OFAC embargo (Iran, Libya, …)" and laid out the

mechanics of the Cover Procedure.  This document noted that for payments by SG to the

customer, "[r]egarding the OFAC rules there is no risk for SOCGEN except if we make a

mistake in the MT202," a reference to the omission of information from the SWIFT message

---

[4] FATF is a policy making body that works to set standards and promote effective implementation of legal,
regulatory, and operational measures for combating threats to the integrity of the international financial system, such
as money laundering and terrorist financing.  In connection with this mission, it issues recommendations designed to
address these threats.

accompanying the transaction, that would, if included, result in the possible blocking of a sanctioned transaction.

17.     The purpose of the Cover Procedure, and the Concealment Practice generally, was to circumvent U.S. sanctions by omitting or falsifying information on payment instructions sent through financial institutions located in New York County.  For example, a senior member of SG's Money Market department back office ("MMBO") wrote to another MMBO employee in 2004 that "[t]he American authorities have now identified the procedure we were using (two MT 202s) to 'circumvent' the OFAC rules." Similarly, IT employees who worked with the systems that automatically filtered payment messages being sent to the United States for references to Sanctioned Entities described these practices as "circumvention circuits," which "circumvent[ed] the OFAC rules, as many other institutions in Europe are also doing."  And, during a July 2004 meeting, the minutes of which were sent to SEGL's group compliance unit ("Group Compliance"), concern was expressed that "SG New York is indicating that the [Federal Reserve] could in the future monitor the covering MT 202 by requesting information on the underlying MT 103: this could put SG at risk for these transactions that are under the US embargo."[5]

18.     SG compliance personnel were aware of the Concealment Practice, and some actively promoted it early in the Review Period.  For example, in 2003, during SG's establishment of internal transaction monitoring (or "filtering") systems designed to assist with identifying and preventing the processing of transactions that would violate U.S. sanctions, a senior member of Group Compliance directed IT employees to use these tools to identify

---

[5] MT 202s and MT 103 are types of SWIFT messages. In the scenario described in the meeting minutes, the underlying MT 103 would have contained the identity of the ultimate sanctioned party originator or beneficiary, which was being omitted from the covering MT 202.

transactions from which party information would have to be removed, so that they would not be blocked by U.S. financial institutions.  Instead of declining to process these transactions, the senior member of Group Compliance  instructed SG employees to "repair[]" them so that they did "not have Swift messages including an indication of [a Sanctioned Entity]."

19.     Starting in May 2004, following an enforcement action by the Federal Reserve against the Swiss Bank UBS for, among other things, engaging in U.S. dollar banknote transactions with countries under U.S. sanctions (the "UBS Action"), SG's various departments gradually discontinued use of the Concealment Practice.  After discussions with SGNY's OFAC Compliance Officer prompted by the UBS Action, SG's Money Market and Treasury Departments switched to fully transparent payments in December 2004.  Another round of discussions with SGNY's OFAC Compliance Officer was prompted by the December 2005 sanctions enforcement action by OFAC and various bank regulators against Dutch bank ABN AMRO (the "ABN AMRO Action").  Those discussions led SG's Correspondent Banking Department to switch to transparent payments for most of its Iranian bank customers in July 2006.  Correspondent Banking continued to utilize the Concealment Practice for a significant Iranian Government bank until September 12, 2006, one day before SG's top management was to meet with the U.S. Department of the Treasury's Under Secretary for Terrorism and Financial Intelligence regarding Iran's use of the global financial system.  Components of BDDF, GLFI, and certain overseas SG offices continued to use the Concealment Practice through early 2007.

20.     In total, SG processed over 9,000 outgoing transactions that failed to disclose an ultimate sanctioned party sender or beneficiary ("non-transparent transactions"), with a total value of more than $13 billion.  The overwhelming majority of these transactions involved an Iranian nexus and would have been eligible for the U-Turn License.  There were, however, at

least 887 non-U-turn transactions with a total value of $292.3 million that were both non-transparent and violated U.S. sanctions.  381 of these transactions with a total value of $63.6 million were related to the Cuban credit facility conduct described below, while the remaining 506 transactions with a total value of $228.7 million involved other SG business with a sanctioned nexus.

### SG's Operation of U.S. Dollar Credit Facilities to Finance Cuban Business

21.     Beginning in at least the early 1990s, SG  offered credit financing to various Cuban-related entities and business enterprises.  Between 2000 and 2010, SG operated 21 credit facilities (the "Cuban Credit Facilities") that involved substantial U.S.-cleared payments through financial institutions located in the County of New York, in violation of TWEA and the Cuba Regulations.  These facilities provided funding to a Cuban government bank ("Cuban Bank 1") that had been designated as an SDN by OFAC, to Cuban government-controlled corporations, and to European corporations in connection with their Cuban business enterprises.  The facilities included loans secured by Cuban tax revenues, sugar, oil, and nickel.

22.     Of these, the credit facility with the largest volume (60.9%) and value (97.8%) of U.S. dollar-denominated transactions ("Cuban Facility 1") was two separate but linked credit facilities originated in 2000 in order to finance oil transactions between a Dutch commodities trading firm ("Dutch Company 1") and a Cuban corporation with a state monopoly on the production and refining of crude oil in Cuba (Cuban Corporation 1).  One facility was a $40 million revolving line of credit, divided between SG and another French bank ("French Bank 1") to finance Dutch Company 1's importation of crude oil into Cuba to be refined there and sold in U.S. dollar-denominated transactions in the local Cuban market (the "Import Facility").  The other facility was a $40 million revolving line of credit to finance Dutch Company 1's purchase

of receivables owed to Cuban Corporation 1 from the sale of oil financed by the Import Facility

(the "Receivables Purchase Agreement"), in which SG's initial exposure was $20 million, and

which decreased over time.  While the Receivables Purchase Agreement was terminated in 2006,

the Import Facility continued through October 2010, when it was replaced with a Euro-

denominated facility.  Between 2003 and 2010 alone, SG engaged in 1,887 U.S. dollar-

denominated transactions in connection with Cuban Facility 1, totaling approximately

$14,736,500,000, which represented the overwhelming majority of the Cuba Credit Facility

transactions.

23.     Between 2000 and 2010, SG maintained 20 other credit facilities for which it

conducted U.S. dollar transactions passing through New York financial institutions that violated

the Cuba Regulations.  Six of these facilities were comprised of loans that SG extended to a

Cuban government bank that was designated as an SDN ("Cuban Bank 1"), three through a

Jersey-incorporated entity for subsequent transfer to Cuban Bank 1 and secured by Cuban

commodities ("Cuban Facilities 4-6") and three directly to Cuban Bank 1 with repayments made

by a different Cuban bank from Cuban tax revenues ("Cuban Facilities 7-9").  Another of these

facilities ("Cuban Facility 2") was comprised of loans that were extended directly to a Cuban

state-owned corporation which operates Cuba's airlines ("Cuban Corporation 2").  Thirteen of

these facilities ("Cuban Facilities 3, 13-18, 26-29, and 24-25") involved loans to European

corporations in order to finance the purchase, production, and/or export of Cuban commodities.

24.     The Cuban Credit Facilities were managed from SG's home office in Paris by the

NAT group within GLFI.  In addition, in 2002, SG established a Cuba task force including both

the RISQ Country Risk department ("RISQ/EMG") and NAT with authority over all of the

Cuban Credit Facilities except for Cuban Facility 1 and a handful of other facilities.

12

25.     Between 2003 and 2010, in connection with the Cuban Credit Facilities, SG engaged in 3,100 unlawful U.S. dollar transactions that were processed through United States financial institutions located in the County of New York, worth approximately $15.1 billion, as illustrated below:

| Facilities | USD Transactions | $ Value (Million) |
|---|---|---|
| Cuban Facility 1 | 1,887 | 14,736.5[6] |
| Cuban Facility 2 | 185 | 39.7 |
| Cuban Facility 3 | 53 | 52.1 |
| Cuban Facilities 4-6 | 168 | 13.7 |
| Cuban Facilities 7-9 | 443 | 91.4 |
| Cuban Facilities 13-18, 26-29 | 302 | 134.9 |
| Cuban Facilities 24-25 | 62 | 18.0 |
| **TOTALS** | 3,100 | 15,086.4 |

*SG's Use of the Concealment Practice in Connection with the Cuban Credit Facilities*

26.     Consistent with SG's broader use of the Concealment Practice, NAT engaged in a deliberate practice of concealing the Cuban nexus of U.S. dollar payments that were made in connection with the Cuban Credit Facilities.  This included a large volume of payments (including those relating to Cuban Facility 1) that did not involve a direct Cuban customer of SG, in which SG concealed the Cuban nexus of payments processed through SGNY. It also included approximately 500 U.S. dollar-denominated payments that SG routed through a particular

---

[6] The terms of the Import Facility required separate weekly drawdowns and repayments, rather than a single netted debit or credit a particular week.  If the payments had been netted the total amount of U.S. dollar payments made in connection with Cuban Facility 1 during this period would have been $2,047,600,000.

Spanish bank ("Spanish Bank 1") before the payments were processed in the United States in order to further disguise the fact that the transactions violated U.S. sanctions.  For example, in a July 2002 memo regarding a proposal for one of the Cuban Credit Facilities, one of NAT's managers advised:

> <u>IMPORTANT</u>
> . . .
> 3) FOR ANY TRANSFER OF FUNDS IN USD FOR WHICH THE BENEFICIARY OR THE BANK HOUSING THE PAYMENTS IS CUBAN, A SPECIFIC PROCEDURE IS IN PLACE:  prepare a SWIFT MT 100 reiterating the payment instructions validly signed by [the joint venture receiving the loan] and send it to [Spanish Bank 1's France office]. Arrange a cash transfer in the amount SG requests to [Spanish Bank 1's France office] without reference of the end Cuban beneficiary.

The use of Cover Payments in processing transactions relating to the Cuban Credit Facilities was ongoing when this manager joined SCF in 2002.

27.      In a December 2004 memorandum to NAT management describing payment flows in connection with the Cuba–related Facilities, NAT employees stated that "SG has always been sensitive to avoiding the use of USD in its Cuban operations" and that it no longer had any "direct flows in USD from/to Cuba in any of its transactions."  Instead, USD flows were made via intermediaries – either banks or non-Cuban corporate entities.  The memorandum further explained the Concealment Practice, describing how the transactions processed through intermediary banks were transmitted "without any reference to a Cuban party/transaction."   With respect to the Receivables Purchase Agreement portion of the Cuban Facility 1 specifically, the memorandum noted that "SG Paris transfers the USD amount to [Dutch Company 1's] account at [a bank in New York] (no reference is made to the Cuban import) and receives the invoice from [Dutch Company 1]."

*SG's Cuban Sanctions Violations Continued Despite Concerns Expressed by Compliance to Top Management.*

28.     Between May and December 2004, SG reconsidered its Cuba business in light of the UBS Action, and began to shift away from U.S. dollar transactions involving Cuba to avoid U.S. scrutiny and possible sanctions enforcement action.

29.     In late November 2004, a senior leader of NAT travelled to Cuba to meet with Cuban banks and government ministries, and communicated to his Cuban counterparties that "given the increased constraints on SG in the context of the reinforcement of the United States' position towards companies working with countries under embargo, SG is considering taking measures to avoid potential difficulties with the U.S. authorities" including "elimination of any transfer in USD between Cuba and SG."

30.     By about this time, SG's Group Compliance had expressed significant concerns about continuing to conduct U.S. dollar transactions with Cuban counterparties in light of U.S. sanctions. As reported in a December 1, 2004 email from a senior leader of Group Compliance to a top executive in SEGL, these included that (1) "any discovery of breach" regarding Cuba "attracts the most stringent punishment," and (2) U.S. authorities, including "criminal authorities," were focusing on U.S. dollar payments that had been sent through U.S. banks.

31.     Several days later, the same senior leader of Group Compliance, after being alerted to a U.S. dollar transaction between SG Canada and an exporter of goods to Cuba in connection with which "[n]o reference to Cuba is made to [the Canadian bank]," contacted the top executive in SEGL and other members of Group Compliance regarding SG's Cuban business.  In that email, the senior leader of Group Compliance noted that "we have lived with the OFAC list for some time and have developed various methods of avoiding it," and asked

whether "given the new regulatory scrutiny in the US on USD payments do we remain satisfied with those methods?"

32.     In mid to late December 2004, as a result of these concerns, SG's top management determined that U.S. dollar transactions in connection with the Cuban Credit Facilities should be eliminated as quickly as possible, but permitted NAT to continue U.S. dollar transactions in the interim.  This decision was first communicated to an SG customer in emails from an NAT employee to Cuban Bank 1 on December 13 and 21, 2004, which stated that "SG top management wishes not to receive/transfer payments in USD any longer as per a scheme to be implemented within the shortest time possible…" and that "SG - and most likely other European lenders alike - has no choice but to eliminate any reference to USD or business involving American entities in its business with Cuba. As you may know, the Spanish bank SCH [Santander] was recently fined by US Authorities for having used USD in 2001 (so remotely !) for its operations with Cuba indirectly. We have no information about any potential threat to their operations in the US but our Compliance Dpt [sic] fears that SG faces such difficulties."

33.     Despite the decisions in 2004 to wind down U.S. dollar transactions for the Cuban Credit Facilities, as well as the Bank's overall Cuban exposure, SG continued to engage in such transactions for almost six years, until October 2010.  SG gradually negotiated repayments of existing facilities in Euros, including through simultaneous foreign exchange transactions, and renewed facilities in Euros or did not renew them at the end of their term.

34.     In the interim, SG continued to engage in U.S. dollar transactions in violation of TWEA and the Cuba Regulations, conducting a total of 1,921 violative transactions with a total value of approximately $10.3 billion from 2005 to 2010.  Many of those transactions were processed through New York County.

16

35.     The conduct continued despite the ongoing awareness of Group Compliance, and despite awareness by the participants of ongoing U.S. sanctions enforcement actions, most notably the December 2005 ABN AMRO Action.  For example, on February 7, 2006, an employee in the RISQ Financial Institutions department ("RISQ/CMC") sent an email to members of NAT, as well as RISQ and Group Compliance employees regarding a meeting held that day with the SGNY Compliance Department regarding transactions with Iranian banks in light of the ABN AMRO Action.  In that email, the RISQ/CMC employee raised concerns that a U.S. investigation of SG's Iran transactions could reveal SG's conduct with respect to Cuba:

> In this manner, by means of an investigation centered on a country such as Iran, the U.S. authorities can put their finger on the movements of funds in USD relating to other countries – so Cuba – . At least, it is what we have understood. Of course, we have not brought up the case of Cuba with the SGNY Compliance Department.  Nevertheless, but we have understood that Iran was – to a certain extent – the "lesser evil" by which the "worst" could happen.

The email noted that "[s]ince end 2005[sic]/beginning 2005, it was decided to avoid to the maximum any transactions executed in USD with Cuba" and described some of the methods used including the foreign exchange procedure that had been implemented for some of the Cuban Credit Facilities.  The employee further wrote that "[w]e can also wonder how the type of USD/EUR foreign exchange transaction mentioned earlier . . . could be perceived by the U.S. authorities and whether it complies with the procedures provided for in the USA for this type of transaction."

36.     During this time, SG continued to utilize the Concealment Practice to disguise the nature of the U.S. dollar transactions it effected in connection with Cuban Credit Facilities.  For example, a January 2006 agreement with respect to Cuban Facility 3 expressly stated that the U.S. dollar payments between SG and a Russian bank that was a sub-participant in the facility should be made through SGNY "without including any mention or reference to Cuba, any Cuban

entity or to the Caribbean, either in the correspondence (electronic, paper or fax), the SWIFT messages or the fund transfer SWIFTS" (underline in original).

*Termination of Cuban Facility 1 and the Final U.S. Dollar Payment.*

37.    By early 2010, all Cuban Credit Facilities had ended or been converted to Euro payments except for Cuban Facility 1.  On March 30, 2010, as part of a NAT effort to refinance this facility, Cuban Facility 1 came to the attention of the recently created Group Sanctions Compliance function, when NAT sought approval to open an SG account in Euros with a Cuban bank acting as collection agent for Cuban Corporation 1 in connection with extending a new U.S. dollar facility to Dutch Company 1 to replace Cuban Facility 1.

38.    A senior leader of Group Sanctions Compliance responded on April 1, 2010, based on information provided by phone, that "we have understood that this transaction is tied to a financing in USD (from SG to [Dutch Company 1] and from [Dutch Company 1] to [Cuban Corporation 1]).  This type of structure is sanctioned by the U.S. Authorities." As a result, Compliance was "unfavorable to this transaction."

39.    Following this objection, a new Euro facility was extended to Dutch Company 1 to replace Cuban Facility 1 in October 2010. In connection with this new facility, Dutch Company 1 paid SG Paris a final $600,000 arrangement fee (the "Arrangement Fee") through SGNY, despite the clear confirmation from Group Sanctions Compliance that U.S. dollar payments in connection with the facility violated U.S. sanctions.  The payment instructions sent to Dutch Company 1 stated that: "The Arrangement Fees [sic], payable in USD should be paid to the following account.  Please pay attention not to mention any reference to [Cuban Corporation 1] within the references of this settlement." NAT employees, including supervisors, responsible for the facility and Cuban Facility 1 received both the instruction  from Group Sanctions

18

Compliance that such an arrangement would be a violation of U.S. sanctions and a copy of the payment instruction, but nonetheless raised no objection.

## SG's Failure to Disclose Its Wrongdoing in a Timely Manner

40.      Despite the awareness of both Group Compliance and senior SG management that SG had engaged in both the Concealment Practice and the unlawful U.S. dollar payments under the Cuban Credit Facilities, SG did not disclose its conduct to OFAC or any other U.S. regulator or law enforcement agency prior to the commencement of the present investigation.

41.      This investigation was triggered by the blocking by other U.S. financial institutions, in March 2012, of two transactions that SG processed on behalf of a Sudanese sanctioned entity, and a subsequent February 2013 voluntary disclosure by SG regarding $22.8 million in transactions with the Sudanese entity and a small amount of transactions with other Sanctioned Entities that violated U.S. sanctions.  The Bank did not disclose the existence of the Concealment Practice and the Cuban Credit Facilities at that time. SG thereafter engaged in discussions with the various criminal and regulatory agencies investigating its conduct (the "Investigating Agencies") regarding the scope of the voluntary lookback the Bank had agreed to conduct into its compliance with U.S. sanctions laws. SG did not disclose the Concealment Practice or the Cuban Credit Facilities during these discussions, and its proposals for the scope of that lookback did not include the time period, business lines, or geographic regions that would have revealed that unlawful conduct. It was only after SG performed a detailed forensic analysis based on the broader scope of investigation required by the Investigating Agencies that it disclosed, in October 2014, the Concealment Practice and the Cuban Credit Facilities to the Investigating Agencies.

19

42.     As a result of this untimely disclosure, the statute of limitations for TWEA or IEEPA violations relating to the Concealment Practice, and to much of the individual conduct involving the Cuban Credit Facilities, had already run by the time the Investigating Agencies learned of them.

### SG's Subsequent Provision of Information to the Government and Remediation Efforts

43.     After the belated disclosure of its misconduct, SG cooperated substantially with the investigation.  SG conducted an extensive and thorough transactional and conduct review and signed tolling agreements and extensions of those tolling agreements with the Government.  Consistent with SG's understanding of its obligations under French law, SG produced voluminous documentary materials to the Investigating Agencies.  SG was also responsive and helpful in presenting the results of its investigation, answering questions for the Investigating Agencies, and facilitating potential interviews of its employees, also pursuant to an MLAT request.

44.     SG has also engaged in significant remediation.  SG terminated its unlawful conduct in 2010 prior to the commencement of any investigation.  Beginning in 2009, SG also made major improvements in its sanctions compliance program.  In 2009, SG created a central Group Sanctions Compliance function, which has increased from a single employee when initiated to 31 employees by 2017.  More generally, SG increased its Group Compliance personnel between 2009 and 2017 from 169 employees to 785 employees, and its Group Financial Crime personnel from 16 to 106.  SG has also made various enhancements to its compliance IT, and the overall Compliance budget has increased from €53.8 million in 2010 to €186 million in 2016.  In July 2010, SG issued a Group Sanctions Policy making clear the scope of U.S. sanctions, and reorganized its policies for escalation and review of potential sanctions

issues.  It implemented a formal recusal policy for U.S. persons working at SG with respect to sanctioned party business in 2014.  SG has also instituted biannual training of employees regarding sanctions issues.